UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GS HOLISTIC, LLC,

                Plaintiff,

                                        Case No. 23-cv-742-pp

   v.

A Z VAPOR, INC. and KHALDON SATI,

                Defendants.

---

GS HOLISTIC, LLC,

                Plaintiff,

                                        Case No. 23-cv-1054-pp

   v.

A-Z TOBACCO, INC. *d/b/a A-Z Tobacco & Vapor Shop*
and KHALDON SATI,

                Defendants.

---

GS HOLISTIC, LLC,

                Plaintiff,

                                        Case No. 23-cv-1056-pp

   v.

A-Z TOBACCO, INC. *d/b/a A-Z Smoke Shop*
and KHALDON SATI,

                Defendants.

---

**ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW (DKT. NO. 54) AND DENYING DEFENDANTS' MOTION FOR A NEW TRIAL WITH THE OPTION OF REMITTITUR (DKT. NO. 51)**

---

On July 30, 2025, after a three-day trial, a jury found the defendants in these three consolidated cases liable for using counterfeit marks under the Lanham Act. Case No. 23-cv-742, Dkt. No. 40; Case No. 23-cv-1054, Dkt. No. 24; Case No. 23-cv-1056, Dkt. No. 23. The jury awarded the plaintiff a total of

1

$2.25 million in damages across the three cases—one $750,000 judgment against AZ Vapor, Inc. and owner Khaldon Sati and two $750,000 judgments against A-Z Tobacco Inc. and Sati. Id. On August 27, 2025, the defendants filed a motion for a new trial with the option of remittitur, dk. no. 51, and a renewed motion for judgment as a matter of law, dkt. no. 54.[1]

The defendants renew their request for judgment as a matter of law, asking the court to dismiss the plaintiff's claims against defendant Sati and to vacate all damages assessed against any defendant for willful infringement. Dkt. No. 54 at 2. The defendants request a new trial on damages unless, within fourteen days of the court's order, the plaintiff accepts a reduction of its statutory damages to $20,000. Dkt. No. 51 at 2. The defendants ask that if the court does not grant the defendants' motion for judgment as a matter of law, it order a new trial on the questions of Sati's individual liability and the finding of willfulness against all defendants. Id.

## I.    Background

### A.    Facts

The plaintiff is a company that manufactures and distributes gravity water pipes under the "Stündenglass" brand name. Dkt. No. 43 at 180:3–10. The plaintiff began making Stündenglass products in May 2020 and registered "Stündenglass" and stylized "S" as trademarks in October 2020. Id. at 182:22–185:8.

---

[1] Unless otherwise noted, the documents cited by the court in this decision were filed in Case No. 23-cv-742.

2

Khaldon Sati owns AZ Vapor and A-Z Tobacco, which operate several smoke shops in Wisconsin. Dkt. No. 44 at 348:25–349:3, 422:20–24. Around July 2021, Safwan Alboushi—the general manager of AZ Vapor and A-Z Tobacco's stores—received a picture of a new kind of gravity water pipe. Id. at 395:5–396:23, 398:3–398:15. Alboushi called Sati on the phone to tell him about the new product, then ordered twelve of the gravity water pipes from a Chinese supplier. Id. at 398:11–399:16. After receiving the twelve water pipes, Alboushi priced them and sent them out to the stores for sale. Id. at 399:3–21. Sati approved the purchase over the phone but otherwise was not involved in the order or distribution of the water pipes to his stores. Id. at 399:22–400:1.

In February 2023, two investigators employed by the plaintiff purchased three counterfeit Stündenglass products from AZ Vapor and A-Z Tobacco stores. Dkt. No. 43 at 136:20–24, 166:8–14. One investigator, Bryan Malamut, testified at trial that he saw three similar counterfeit products in an AZ Vapor store when he made his purchase. Id. at 156:21–23. The other investigator, AJ Colon, testified that he purchased the only two counterfeit products he saw, but that the clerk mentioned that the store had stocked "multiples" of the products in the past. Id. at 176:19–21.

In June and August 2023, the plaintiff filed three complaints[2] against the defendants, alleging that they had sold counterfeit gravity water pipes that infringed on the plaintiff's trademarks in violation of the Lanham Act. Case No.

_____

[2] Each complaint was directed toward a different smoking goods store; all three stores were owned by AZ Vapor and/or A-Z Tobacco, which are owned by Sati.

3

23-cv-742, Dkt. No. 1; Case No. 23-cv-1054, Dkt. No. 1; Case No. 23-cv-1056, Dkt. No. 1. After the defendants received notice of the lawsuit, Alboushi discarded the last two counterfeit water pipes the stores had in stock. Dkt. No. 44 at 400:8–23. Alboushi testified at trial that he was not aware that the pipes were counterfeit until he received notice of the lawsuit. Id. at 400:8–12. Alboushi now stocks the stores with authentic Stündenglass products, but the authentic pipes do not sell well due to their high price. Id. at 401:10–23.

  B.  Jury Trial

The court granted the parties' joint motion to consolidate the three cases, dkt. no. 16, and held a three-day trial on the consolidated cases from July 28, 2025 to July 30, 2025, dkt. nos. 43–45. The parties stipulated that the plaintiff's trademarks were valid and that the water pipes that were the subject of the lawsuits were counterfeit products. Dkt. No. 44 at 385:5–22. The plaintiff presented several witnesses: the investigators who purchased the counterfeit products, the plaintiff's CEO and CFO and a market research expert. The plaintiff also read excerpts of Sati's deposition testimony into the record.

At the close of the plaintiff's case, the defendants moved for judgment as a matter of law on the grounds that there was insufficient evidence to support Sati's individual liability for the infringement and that there was insufficient evidence that any of the defendants acted willfully. Id. at 386:25–387:16. The plaintiff responded that Sati was aware that counterfeiting is a problem in this industry, yet took "no steps to authenticate the suppliers" from whom he purchased products. Id. at 388:13–389:7. The plaintiff argued that Sati had

4

testified at deposition that he was actively involved in purchasing products for his stores and had admitted to discarding promotional materials from brands that could contain warnings about counterfeit products. Id. at 389:21–391:24.

In denying the motion, the court opined that the evidence of willfulness was "pretty thin and pretty circumstantial." Id. at 392:17–18. But it recounted that the standard for willfulness in the Seventh Circuit is "that the defendant knew that the mark was counterfeit . . . or that the defendant acted with reckless disregard." Id. at 392:23–393:2. Relying on the testimony about the counterfeiting problems in the industry and Sati's testimony that he didn't read marketing literature mailed to him, the court determined that there was "enough evidence here that a reasonable jury might conclude based on it that Mr. Sati acted with reckless indifference, and that would be sufficient under the Seventh Circuit definition of willfulness." Id. at 393:19–22. The court opined that there were no grounds to dismiss Sati as a defendant outright because "these were his stores, and as we know, sellers are subject to strict liability under the Lanham Act and so technically he is a seller." Id. at 393:25–394:3.

As stated, the jury returned three verdicts awarding $750,000 in damages under 15 U.S.C. §1117(c). Case No. 23-cv-742, Dkt. No. 40; Case No. 23-cv-1054, Dkt. No. 24; Case No. 23-cv-1056, Dkt. No. 23. In each case, the jury awarded $100,000 in statutory damages and an additional $650,000 for "any defendants' willful use of the 'Stündenglass' and/or stylized 'S' trademarks." Id. The court entered three $750,000 judgments: a judgment

against AZ Vapor and Sati, Case No. 23-cv-742, dkt. no. 42; a judgment against A-Z Tobacco and Sati, Case No. 23-cv-1054, dkt. no. 26; and a judgment against A-Z Tobacco and Sati, Case No. 23-cv-1056, dkt. no. 25.

## II.     Renewed Motion for Judgment as a Matter of Law (Dkt. No. 54)

Because the defendant's motion for a new trial asks for alternative relief in the event the court does not grant the motion for judgment as a matter of law, the court will begin with the renewed motion for judgment as a matter of law.

### A.     Parties' Arguments

The defendants argue that the jury lacked sufficient evidence to find Sati individually liable for infringement. Dkt. No. 55 at 13. They argue that under Dangler v. Imperial Mach. Co., 11 F.2d 945 (7th Cir. 1926), an officer of a corporation is not liable for the infringing activities committed by the corporation absent some "special showing" that the officer participated in the infringement knowingly or had notice of the infringement. Id. at 13–14. According to the defendants, an officer acts "willfully and knowingly" when he "personally participates in the manufacture or sale of the infringing article," uses the corporation "to carry out his own willful and deliberate infringements" or uses the corporation "with the purpose of avoiding personal liability." Id. at 14 (quoting Dangler, 11 F.2d at 947). The defendants argue that an individual is not strictly liable for the sale of counterfeit products by virtue of his position as an owner or officer; he must have a knowing or active role in the infringing activity. Id. at 14–16 (collecting cases). They assert that at the very least, the

6

individual officer must have had notice of the counterfeiting to be held directly liable. Id. at 17. They contend that such notice was present in Microsoft Corp. v. Ram Distribution, LLC, 625 F. Supp. 2d 674, 684–85 (E.D. Wis. 2008), where the officer was held liable for trademark infringement because he knowingly disregarded warnings he received from Microsoft about allegedly infringing activity. Id.

Having laid this framework, the defendants argue that the evidence presented at trial does not satisfy Dangler's "special showing." Id. They contend that there is no evidence that Sati knowingly sold counterfeit goods or that he used his stores for the sole purpose of trading in counterfeit goods. Id. The defendants argue that the evidence shows Sati's companies purchased twelve water pipes that Sati did not know were counterfeit. Id. They recount that Sati testified that he "made efforts to buy from legitimate suppliers, avoided suppliers he understood to be disreputable, and followed instructions from brands when warned of disreputable products." Id. (citing Dkt. No. 44 at 359:15–360:15, 372:7–13). The defendants assert that as soon as they learned the products were counterfeit, the stores began buying the authentic product from a local supplier. Id. at 18. They contend that there is no evidence that they received notice of the plaintiff's brand or notice that its pipes were being counterfeited. Id. They argue that witnesses testified that it was difficult to distinguish the counterfeit pipes from the authentic pipes without a "trained eye"—someone who had "done research on the products." Id. (quoting Dkt. No. 43 at 145:4–7). They assert that although the plaintiff sent representatives to

7

educate retailers about the product, the plaintiff did not send those representatives to Sati's stores or otherwise notify him about the risk of counterfeit products. Id.

The defendants argue that the evidence they presented after the plaintiff rested its case supports their position. Id. at 19. They recount that Alboushi testified that he was responsible for ordering the water pipes and that Sati's only involvement was approving the purchase during a phone conversation. Id. (citing Dkt. No. 44 at 398:3–400:1). The defendants argue that the plaintiff failed to present evidence that Sati was personally involved in his companies' purchase and sale of infringing goods or that Sati was on notice of the infringement. Id.

The defendants next argue that there was insufficient evidence at trial to support a finding that any defendant acted willfully. Id. at 20. They argue that to establish "willful blindness" to a trademark holder's rights, the plaintiff must show that the defendant suspected wrongdoing and deliberately failed to investigate. Id. (quoting Microsoft, 625 F. Supp. at 684). They maintain that willful blindness exceeds recklessness or negligence, id. (quoting Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769 (2011)), and that it typically requires that the defendant be on notice of the counterfeiting; failure to take precautions against counterfeiting is insufficient, id. (quoting Microsoft, 625 F. Supp. at 684).

The defendants say that there is no evidence that any defendant had actual notice of the infringement before the plaintiff filed its lawsuits. Id.

8

According to the defendants, the fact that they sold the pipes at a profit does not establish that they knew that the products were counterfeit because every retailer seeks to sell goods at a profit. Id. at 21. The defendants argue that although the plaintiff's expert testified that counterfeiting is a problem in this industry, the plaintiff did not try to warn Sati or his companies about the risk of counterfeit products. Id. The defendants maintain that "general knowledge" that there are counterfeit products on the market is not enough to prove that the defendants knew that they should be looking out specifically for counterfeit water pipes for sale. Id. They argue that the evidence shows that they take precautions and try to avoid counterfeit goods when they receive notice of such goods on the market. Id. at 22 (citing Dkt. No. 44 at 359:15–360:15, 372:7–13). They also argue that the evidence shows that as soon as they received notice that the pipes they had purchased were counterfeit, they immediately discarded the remaining products and that they now purchase the authentic product. Id. (citing Dkt. No. 44 at 375:14–376:9, 400:2–23). The defendants argue that there is no evidence that any defendant suspected counterfeiting and deliberately failed to investigate the products. Id.

Alternatively, the defendants argue that even if the stores could be found to have acted willfully, there is insufficient evidence to support such as finding as to Sati. Id. They assert that Sati did not communicate with the supplier, did not purchase or distribute the product to the stores and was "uninvolved" with the order other than to approve the initial purchase over the phone. Id. at 22–23.

The plaintiff responds that the defendants are estopped from contesting Sati's liability. Dkt. No. 59 at 6. According to the plaintiff, when the defendants moved for a directed verdict on Sati's individual liability, the court questioned defense counsel regarding whether the defendants already had conceded Sati's liability. Id. (citing Dkt. No. 44 at 455:5–10). According to the plaintiff, by conceding that the defendant companies offered counterfeit products for sale and that Sati is considered a seller as the owner and officer of those companies, the defendants conceded Sati's individual liability. Id. The plaintiff argues that the defendants are estopped from now arguing that there was insufficient evidence to find Sati liable, because the plaintiff relied on the defendants' concessions when presenting its case. Id. at 6–7. The plaintiff points to the verdict forms, arguing that "liability for each individual case was intended without objection from the Defendants." Id. at 7.

The plaintiff argues that the evidence supports Sati's liability for the infringement because he was personally involved in the infringing activity. Id. It asserts that Sati was responsible for the "day-to-day running" of the defendant stores and that he approved his employee's purchase of the infringing products. Id. It argues that Sati is strictly liable for infringement because he is a seller of counterfeit goods via his stores. Id. The plaintiff asserts that Sati was aware of the risk of counterfeit products in the smoke shop industry—and the risk of buying counterfeit products from Chinese distributors, in particular— yet chose to approve the purchase of the water pipes from a Chinese distributor without attempting to verify the product's authenticity. Id. at 8 (citing Dkt. No.

10

44 at 374:11-17, 444:23-445:13). The plaintiff argues that this evidence is sufficient to satisfy <u>Dangler</u>'s "special showing" requirement. <u>Id.</u> at 8–9.

The plaintiff reiterates that Sati testified that he personally approved the purchase of the counterfeit products, which the plaintiff says constitutes "direct involvement" in the purchase. <u>Id.</u> at 9. It argues that Sati testified that he is personally involved in the day-to-day operations of his business and would have seen the counterfeit products on display during his bi-monthly store visits. <u>Id.</u> at 9–10 (citing Dkt. No. 44 at 351:24-352:2). According to the plaintiff, Sati also admitted that he does not attempt to authenticate suppliers or products. <u>Id.</u> at 10 (citing Dkt. No. 44 at 364:20-365:4). The plaintiff argues that this deliberate refusal to implement quality control checks—despite knowing the risks of counterfeit products—supports the jury's finding of liability. <u>Id.</u>

The plaintiff also argues that the evidence contradicts Sati's claim that only twelve infringing products were purchased. <u>Id.</u> The plaintiff argues that the defendants purchased the "Kompact" version of the Stündenglass product, which was not on the market at the time of the alleged purchase. <u>Id.</u> It characterizes Sati as "evasive" when confronted with this fact at trial and alleges that Sati must have personally made other purchases beyond Alboushi's initial twelve-item order. <u>Id.</u> at 10–11. The plaintiff argues that from all this evidence, the jury could find that Sati either was personally involved in the infringement or willfully blind to the risk of infringement. <u>Id.</u> at 11.

The plaintiff argues that there was sufficient evidence for the jury to conclude that all the defendants acted willfully. Id. at 12. It argues that it was not required to present evidence that the defendants had actual knowledge of the infringement prior to the suit. Id. at 13. According to the plaintiff, notice is strong evidence of willfulness but is not a necessary element. Id. at 13–14 (collecting cases). The plaintiff argues that Sati failed to take steps to verify the products' authenticity despite knowing that counterfeiting problems are prevalent in the industry. Id. at 14. The plaintiff asserts that this shows willful blindness, because the defendants suspected wrongdoing but failed to investigate. Id. at 14–15. The plaintiff argues that Sati testified that he discards any marketing materials sent to him, suggesting that he deliberately avoids information that could alert him to counterfeiting issues. Id. at 15. It asserts that Sati testified that he does not investigate the suppliers from whom he purchases products because he believes there is no legal requirement for him to do so. Id. (quoting Dkt. No. 44 at 435:20-436:2). The plaintiff argues that the defendants did not exercise any due diligence to ensure they were not purchasing counterfeit products. Id. at 17–18. It argues that, at minimum, the evidence shows that the defendants acted with "indifference" to the plaintiff's rights. Id. at 18.

The defendants reply that judicial estoppel does not bar them from challenging Sati's individual liability. Dkt. No. 64 at 4. According to the defendants, judicial estoppel applies only if a party prevailed on a legal or factual ground and successfully convinced the court to adopt its position. Id. at

12

5. The defendants argue that they moved for a directed verdict during the trial, asking the court to dismiss with prejudice all claims as to Sati, but that the court denied that motion, so they did not prevail. Id. (citing Dkt. No. 44 at 387:1–7, 393:25–394:13). The defendants argue that the question of whether the defendants used an infringing mark is separate from whether Sati is individually liable for that infringement. Id. The defendants admit that "the language was not always precise," but they argue that the record demonstrates that they contested Sati's personal liability throughout the case. Id. at 5–6.

The defendants contend that the plaintiff failed to identify any evidence to support Dangler's "special showing. Id. at 6. They argue that the plaintiff relies too heavily on Sati's status as an owner or officer, which—standing alone—is insufficient to establish liability. Id. at 6–7. They argue that the evidence does not show that Sati inspected the counterfeit goods upon delivery or personally sold them, only that he approved his employee's purchase of the products. Id. at 8–9. The defendants emphasize that Sati runs small businesses, so it is understandable that there is no training program or policy in place designed to address and combat possible infringement. Id. at 9. They maintain that Sati never had been accused of infringement before and that the goods at issue in this case are a miniscule portion of the defendants' business. Id. at 9–10.

The defendants argue that the plaintiff minimizes its failure to provide pre-suit notice of the infringement. Id. at 10. They assert that notice is the most persuasive evidence of willfulness. Id. They say that in the absence of pre-

suit notice, there must be evidence that the defendants had actual notice of their infringement. Id. at 10–11 (collecting cases). The defendants contend that general knowledge of counterfeiting in the industry is not enough to establish that the defendants should have known that these specific products were counterfeit. Id. at 11–12. They maintain that the plaintiff admitted that it didn't send the defendants any materials—either materials warning about counterfeit products or otherwise. Id. at 12–13 (citing Dkt. No. 44 at 337:23–338:7, 341:3–11; 375:14–376:3). They argue that the plaintiff's products were new to the market and that their mark and brand were not well-known to the defendants, so the defendants would have had no knowledge of counterfeiting problems specific to the plaintiff's products. Id. at 13. As to the purchases of the "Kompact" model, the defendants assert that the plaintiff's CEO admitted that the Kompact already was being manufactured in China when Alboushi ordered the water pipes for the defendants. Id. (citing Dkt. No. 43 at 194:23–196:7, 226:16–18). The defendants argue that the products could have been counterfeited during the manufacturing stage before they officially were on the market. Id. at 13–14. The defendants urge the court not to credit the plaintiff's speculation that there were other purchases solely because the defendants purchased the Kompact models. Id. at 14.

The defendants argue that even if the willfulness finding could stand against the corporate defendants, it cannot stand for Sati. Id. at 14–15. They assert that willfulness requires an even greater showing on top of Dangler's "special showing" for corporate officer liability. Id. at 15. They maintain that

Sati's failure to investigate the authenticity of the product is not sufficient to establish willfulness. Id.

B.    Legal Standard

Rule 50(a)(2) of the Federal Rules of Civil Procedure states that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitled the movant to the judgment." If the court does not grant a Rule 50(a) motion, the movant may renew the motion within twenty-eight days after the entry of judgment, or if the motion addresses a jury issue not decided by a verdict, no later than twenty-eight days after that jury was discharged. Fed. R. Civ. P. 50(b).

The court must consider whether a rational jury could return a verdict for the nonmovant; if it could, it must deny the motion. Fed. R. Civ. P. 50(a)(1); Passananti v. Cook County, 689 F.3d 655, 659 (7th Cir. 2012); Mathur v. Bd. of Trustees of S. Ill. Univ., 207 F.3d 983, 941 (7th Cir. 2000). The court must view the evidence presented at trial in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Martin v. Milwaukee County, 904 F.3d 544, 550 (7th Cir. 2018).

C.    Analysis

1.    *Sati's Individual Liability*

The plaintiff argues that the defendants are estopped from challenging Sati's individual liability. "The doctrine of judicial estoppel provides that 'when a party prevails on one legal or factual ground in a lawsuit, that party cannot

15

later repudiate that ground in subsequent litigation based on the underlying facts.'" Pakovich v. Broadspire Servs., Inc., 535 F.3d 601, 606 (7th Cir. 2008) (quoting Urbania v. Cent. States, Se. & Sw. Areas Pension Fund, 421 F.3d 580, 589 (7th Cir. 2005)). Judicial estoppel "bars a litigant who has obtained a judgment on the basis of proving one set of facts from obtaining a second judgment by turning around and proving that the facts were actually the opposite of what he had proved in the prior case." Reynolds v. City of Chicago, 296 F.3d 524, 529 (7th Cir. 2002). "To apply, (1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same in both cases; and (3) the party to be estopped must have prevailed upon the first court to adopt the position." Urbania, 421 F.3d at 589. Judicial estoppel also can apply to matters argued in a single case; in that circumstance, it "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000). Whether the contradictory argument is raised in the same case or a subsequent case, a key element is that the party must have prevailed on the argument it subsequently seeks to rebut.

Despite using the phrase, the plaintiff is not arguing judicial estoppel. The defendants did not "prevail" by arguing that Sati was individually liable for infringement; they (rather obviously) made no such argument. The plaintiff is asserting that the defendants *conceded* Sati's liability. That argument begs the

16

question of whether the defendants waived their right to challenge Sati's

individual liability.

The exchange upon which the plaintiff relies to support its argument that

the defendants waived their right to challenge Sati's individual liability took

place near the end of the case, when the parties were discussing jury

instructions:

> Plaintiff's Counsel: [I]f counsel is maintaining that there needs to be a finding against Mr. Sati on the first part, on the -- on the infringement, the trademark infringement claim, not the will -- I know we got to have the jury decide the willfulness, but if he -- I don't know what his position is, in which case then I need to move for directed verdict in regard to Mr. Sati being part of the -- part of the infringement. Part A.

> The Court: Are you asking whether or not they're conceding that Mr. Sati used the infringed upon marks?

> Plaintiff's Counsel: Yes. Because if he is, then I don't need to make a directed verdict motion because then we've got it solved. But if counsel is saying, no, I want it in the verdict that we have to determine whether Mr. Sati was part of it, then -- then I need to have the directed verdict in order to be able to resolve that.

> The Court: My understanding has been that he was conceding that issue and no verdict form that you all have ever proposed to me had that issue in it, but I guess I'll ask. [Defendants' counsel], is there -- is there a question over whether or not Mr. Sati used the counterfeit or infringed upon marks?

> Defendants' Counsel: No, it's never been an issue. . . . Because it's my understanding under the Act that as the owner he can be found liable.

Dkt. No. 44 at 454:14–455:19.

But earlier, at the close of the plaintiff's case, the defendants brought an

oral motion for a directed verdict as to the plaintiff's claims against Sati:

17

> Defendants' Counsel: Plaintiff -- or, I mean, defense brings a motion,
> excuse me, motion for directed verdict as to plaintiff's claims against
> defendant Khaldon Sati. Plaintiff has not produced any evidence
> that Mr. Sati acted willfully, that he was directly involved with the
> purchase of the counterfeit products, and so the first motion is to
> have him dismissed with prejudice as to all claims.

Id. at 387:1–7. The plaintiff did not respond by arguing that the defendants already had conceded Sati's liability. See id. at 388:13–391:8. When ruling on the motion, the court did not state that the defendants had conceded Sati's liability or ask whether the defendants were conceding Sati's liability. Id. at 392:3–394:13. If the defendants made any concession regarding Sati's individual liability, it occurred *after* the defendants made their motion for a directed verdict.

Similarly, the verdict forms are unclear. The verdict forms that the parties initially proposed asked the jury, "Do you find that Khaldon Sati, is liable for trademark infringement by counterfeiting?" and directed the jury to select either a "yes" or "no" option. Dkt. Nos. 28-4, 28-5, 28-6. The second page of the proposed verdict form separately asked whether the jury found that Sati's infringement was willful. Dkt. Nos. 28-4, 28-5, 28-6. But the final verdict forms that the court provided the jury asked only, "Did defendant Khaldon Sati *willfully* use the Stündenglass and/or stylized 'S' trademarks?", and then directed the jury to respond either "yes" or "no." Case No. 23-cv-742, Dkt. No. 40 (emphasis added); Case No. 23-cv-1054, Dkt. No. 24; Case No. 23-cv-1056, Dkt. No. 23. There was no predicate question asking the jury whether Sati was liable for infringement—only a question regarding whether his infringement was willful. In other words, the final verdict form presumed that Sati was liable

18

because defense counsel had advised the court that he believed that Sati could be held strictly liable as a seller of infringing products—even though he'd argued earlier in the trial that the court should dismiss the claims against Sati due to lack of personal involvement in the infringement.

A review of the applicable law is necessary to clear up the confusion. "Sellers bear strict liability for violations of the Lanham Act." Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1152 (7th Cir. 1992). But that strict liability does not extend to the officers of a corporation selling the infringing product:

> [I]n the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. . . . It is when the officer acts willfully and knowingly—that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability—that officers are held jointly with the company.

Dangler, 11 F.2d at 947. If a corporate officer or owner of a business could always be held strictly liable as a "seller," Dangler's "special showing" requirement would have no meaning. See Century 21 Real Est., LLC v. Destiny Real Est. Props., No. 11-CV-38, 2011 WL 6736060, at *7 (N.D. Ind. Dec. 19, 2011) ("[I]f officers or owners were personally liable for their corporation's infringement based solely on their role or ownership interest, owners and officers would be liable as a matter of course, which is plainly not what Dangler envisioned."). Defense counsel's assertion during the jury instruction conference—which the court erroneously accepted—was an inaccurate

19

statement of law, because Sati cannot be held strictly liable for infringement *solely* by virtue of his ownership interest in the infringing company.

The confusion—the court's, or the jury's—also may have stemmed from the phrasing of the parties' stipulations. The parties stipulated that the counterfeit water pipes "were offered for sale by the defendants . . . and are likely to be confused with authentic Stündenglass waterpipes." Dkt. No. 44 at 385:5–22. Defense counsel's statement that it had "never been an issue" regarding whether Sati "used" the infringing products in commerce was correct to the extent that the parties had stipulated that the infringing products were sold, and therefore "used," by the defendants. Yet at the close of the plaintiff's case, defense counsel orally moved for a directed verdict on the claims against Sati as an individual, suggesting that he must have believed at that point in the trial that Sati's individual liability still was at issue.

On review, it is difficult for the court to determine whether defense counsel intended to concede Sati's liability at the end of the trial. But what *is* clear on the record is that at the close of the plaintiff's case, the defendant moved for judgment as a matter of law on Sati's individual liability. At that time, the verdict form had not been finalized and it appeared that Sati's individual liability was an issue the jury would be asked to decide. The plaintiff presented its case knowing that the proposed verdict form asked the jury to decide whether Sati was individually liable for infringement. It is difficult to see how the defendants' later failure to object to a different verdict form—one prepared by the court, after the close of the plaintiff's case and argument on

20

the jury instructions—would have affected how the plaintiff presented its case in chief. The defendants raised Sati's individual liability as a ground for judgment as a matter of law and properly have renewed that ground in a post-trial motion. The court concludes that the defendants did not waive this argument and that they are not estopped from asserting it.

Under Dangler, the plaintiff must make some "special showing" that Sati is liable for his corporation's infringements. 11 F.2d at 947. To make that "special showing," the plaintiff must show that Sati "personally participate[d] in the manufacture or sale of the infringing article," "use[d] the corporation as an instrument to carry out his own willful and deliberate infringements" or "use[d] an irresponsible corporation with the purpose of avoiding personal liability." Id. The plaintiff does not argue—and there was no evidence presented at trial that would support—the second or third methods of making the Dangler showing (that Sati used the corporation as an instrument to deliberately infringe, or that he used an irresponsible corporation to avoid personal liability). The plaintiff relies on the first method, arguing that the evidence demonstrates that Sati personally participated in the sale of the infringing items.

The Seventh Circuit has not recently addressed Dangler or its special showing requirement. Looking back in time, one Seventh Circuit case affirmed a judgment imposing individual liability on a corporate officer where he personally designed the infringing product, "which he deliberately made identical" to the plaintiff's product. Weller Mfg. Co. v. Wen Prods., Inc., 231 F.2d 795, 801 (7th Cir. 1956); see also Adventures in Good Eating v. Best

Places to Eat, 131 F.2d 809, 813 (7th Cir. 1942) (judgment against officer affirmed where he provided the plaintiff's book to an employee and directed the employee to copy it). In another, the appellate court reversed a judgment against a corporate officer who did not design or personally sell the infringing product because he "did nothing beyond the scope of his duties as president of the defendant company." Powder Power Tool Corp. v. Powder Actuated Tool Co., 230 F.2d 409, 414 (7th Cir. 1956). These cases suggest that a high degree of involvement in the infringing activity is necessary to support corporate officer liability.

The more recent district court case law examining Dangler's "special showing" discusses what facts must be *pled* to state a claim against a corporate officer. Few cases discuss the standard at summary judgment or trial. In one case, the Northern District of Illinois found that the evidence presented at trial established that one corporate officer had personally participated in the infringing activity because he "decided to use the Diesel Test name, was involved in creating the label, managed the sales of Diesel Test, made the decision to continue selling Diesel Test after Curry's cease-and-desist request, and attempted to register for a federal trademark on Diesel Test after learning of Curry's common law trademark." Curry v. Revolution Lab'ys, LLC, No. 17 C 2283, 2023 WL 5509337, at *20 (N.D. Ill. Aug. 25, 2023), aff'd, 124 F.4th 441 (7th Cir. 2024). The Curry court also found the evidence sufficient to support individual liability for a second officer who "consulted with Joshua on the Diesel Test name, was involved in the decision to ignore Curry's cease-and-

22

desist request, and encouraged Joshua's filing of Revolution's Diesel Test trademark application." Id. at *21. In another case, a court in the same district denied summary judgment on the corporate officers' individual liability where the only evidence of personal participation was that the officers had purchased and resold infringing products, stating that "[t]he fact that the Individual Defendants knowingly sold product that turned out to be infringing does not establish that they knew the product was infringing at the time they sold it." Top Tobacco, L.P. v. Midwestern Cash & Carry, LLC, No. 11 C 4460, 2014 WL 243431, at *7 (N.D. Ill. Jan. 22, 2014)

At the motion to dismiss stage, district courts have found complaints to state a claim against a corporate officer when the complaint pleads facts showing that the officer was personally involved in the design, manufacture or sale of the infringing product *with the knowledge* that the product likely infringed another's intellectual property. See, e.g., C.S.B. Commodities, Inc. v. Urb. Trend (HK) Ltd., 626 F. Supp. 2d 837, 860 (N.D. Ill. 2009) (complaint stated claim against officer where it alleged he personally selected the configuration of the infringing product and directed the company to market the product to trade on the goodwill of the original product); Syscon, Inc. v. Vehicle Valuation Servs., Inc., 274 F. Supp. 2d 975, 977 (N.D. Ill. 2003) (complaint stated claim against officer who engaged a third party company to complete a software program the plaintiff had started using the plaintiff's source code); Peaceable Planet, Inc. v. TY, Inc., 185 F. Supp. 2d 893, 896–97 (N.D. Ill. 2002) (complaint stated claim against president and founder by alleging continuing

use of the infringing mark in commerce after receiving notice of the plaintiff's trademark); Big Daddy Games, LLC v. Reel Spin Studios, LLC, No. 12-CV-449, 2012 WL 12995406, at *5 (W.D. Wis. Aug. 24, 2012) (complaint stated claim against officer who personally coded the infringing software).

The court gleans from these cases that personal participation under Dangler means that the corporate officer must have had a hand in designing, selecting or continuing to sell the infringing product with knowledge or notice that the product infringed upon another's intellectual property. That standard aligns with the Lanham Act's standard for willful infringement, which requires that a defendant act with knowledge or willful blindness toward the trademark holder's rights. See Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1149 (7th Cir. 1992). This makes sense; Dangler states that a corporate officer is liable when he "acts willfully and knowingly." Applying a lower standard would lead to corporate officers being held liable simply by virtue of their position in the corporation, which functionally would eliminate Dangler's "special showing" requirement.

Applying that standard, and based on the evidence presented at trial, a rational jury could not return a verdict finding that Sati is individually liable for trademark infringement. The evidence presented at trial shows that Alboushi received an image of the water pipes via WhatsApp, that he called Sati to discuss the product and that Sati approved the purchase. Dkt. No. 44 at 398:6–15. Alboushi testified that the stores needed new product quickly because of supply chain issues during 2020 and 2021, so the decision was

24

made quickly. Id. at 398:16–24. Alboushi testified that Sati was not involved in the purchase other than to grant Alboushi permission to buy the product. Id. at 399:24–400:1. Sati also testified that he gave Alboushi the approval to purchase the product. Id. at 425:24–426:4. Sati testified that he did see a picture of the product before ordering it, but that he was unfamiliar with the plaintiff's brand and thought it was a new product. Id. at 421:22–422:1, 432:15–22 ("The conversation, send me the picture. Oh, looks good. Okay. Order the minimum. That was the conversation, technically."). Sati and Alboushi did not learn that the product was counterfeit until receiving notice of these lawsuits, and Alboushi promptly discarded the remaining counterfeit pipes. Id. at 400:8–23. There is no evidence to suggest that Sati knew that the pipes were counterfeit when he approved the initial order, and no evidence that Sati continued to purchase and sell the counterfeit pipes after receiving notice from the plaintiff that the products were counterfeit. The evidence is insufficient to make out Dangler's special showing for individual officer liability.

The court will grant the defendants' renewed motion for judgment as a matter of law as to Sati's individual liability and will vacate the judgments against Sati.

### 2. *Willfulness*

As to willfulness, there is insufficient evidence to support enhanced damages against the corporate defendants. "A defendant commits willful trademark infringement when the defendant acted with 'willful blindness' to the trademark holder's rights." Microsoft, 625 F. Supp. 2d at 684 (citing Hard Rock

Cafe, 955 F.2d at 1149). "To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate." Hard Rock Cafe, 955 F.2d at 1149. Finding that the defendant failed to take reasonable precautions against counterfeiting is not enough to establish willful blindness. Id. "[E]vidence that notice has been accorded to the alleged infringer before the specific acts found to have constituted infringement occurred is perhaps the most persuasive evidence of willfulness." Chi–Boy Music v. Charlie Club, Inc., 930 F.2d 1224, 1227 (7th Cir. 1991) (quoting Video Views, Inc. v. Studio 21, 925 F.2d 1010, 1021 (7th Cir. 1991)).

There is insufficient evidence for a rational jury to find that the defendants acted with willful blindness to the plaintiff's rights. The defendants were unaware of the plaintiff's brand or that they had purchased counterfeit products until the plaintiff filed these lawsuits. See Dkt. No. 43 at 230:18–20; Dkt. No. 44 at 341:3–11, 375:14–376:3. Although Sati did not direct Alboushi to research the product or supplier to confirm that the product was authentic before buying it, the "[s]imple failure to take precautions against counterfeiting" is insufficient to support a finding of willfulness. Microsoft, 625 F. Supp. 2d at 684 (citing Hard Rock Cafe, 955 F.2d at 1149).

It is true that Sati testified he was aware that Chinese manufacturers can copy products. See Dkt. No. 44 at 443:14–20 ("If China duplicate everything, this is their style, they can duplicate anything you want. The question is when you have it protected, you can protect yourself, just don't manufacture in China."); 445:1–13 ("You manufacture it in China, you could've

26

manufactured it in the United States if you want to protect your product and patent it."). But there is no evidence that Sati knew when he approved the order that this particular product or type of product was counterfeit. Sati testified that he believed that it was a new product and that he was unfamiliar with the plaintiff's brand before this lawsuit. If Sati was previously not aware of the product and brand, he would have no reason to suspect that the product was a counterfeit version. Standing alone, the generalized knowledge that Chinese manufacturers can counterfeit products is not enough to show that the defendants suspected wrongdoing and deliberately failed to investigate.

The plaintiff argues that because investigators found the Kompact model water pipes at the defendants' stores and the Kompact model was not available for sale at the time Alboushi ordered the initial twelve water pipes, there must have been a second, later order that Sati himself placed, possibly with the knowledge that the pipes were counterfeit. Sati testified that he did not personally purchase any more water pipes beyond approving Alboushi's initial twelve-item order. Dkt. No. 44 at 426:10–13. Alboushi testified that he is the person who receives store inventory, so if any more water pipes had been ordered, he would have been the one to receive them. Id. at 407:25–408:2. The plaintiff's CEO testified that the Kompact model already was being manufactured (counterfeited) in China when Alboushi placed the July 2021 order for twelve water pipes. Dkt. 43 at 194:23–196:7, 226:16–18. That means that the counterfeiter would have had access to the Kompact model design at the time Alboushi ordered the water pipes, even if the authentic Kompact

model was not yet available for sale. The plaintiff's suggestion that there was a second order containing the Kompact pipes is speculation and is contradicted by Sati's and Alboushi's testimony.

Even if there was evidence that Sati or Alboushi had placed a second order, there is no evidence that either of them knew that the products were counterfeit at the time such an order would have been placed. One of the plaintiff's investigators testified that it was difficult for an untrained eye to tell the difference between the counterfeit pipes and the authentic pipes. Dkt. No. 43 at 145:2–8 ("When you look at the box, they're almost identical in every single way. That's what makes it very difficult to tell unless you know the product."). And the plaintiff's CEO conceded that the plaintiff did not provide the defendants any counterfeit-identification training. Id. at 231:6–232:3, 233:13–16. The defendants, who were unfamiliar with the product, would not have known based on the initial twelve-item order and on appearance alone that the products were counterfeit. They would not have been on notice that the products were counterfeit at the time they made any theoretical second order. This evidence cannot support a finding of willful blindness.

The court will grant the defendants' motion for judgment as a matter of law as to the finding of willfulness and will vacate the damages imposed against the remaining corporate defendants that were based on willfulness.

### III. Motion for New Trial with the Option of Remittitur (Dkt. No. 51)

The defendants argue that the plaintiff is entitled to only one damages award for the defendants' infringement and that the award should not exceed

28

$20,000 based on similar damages awards in this district. Dkt. No. 52 at 3. They also argue that the award violates the Due Process clause. Id. at 3–4. The defendants ask that the $20,000 award be a single award imposed jointly and severally against all defendants. Id. at 14.

Because the court is granting the defendants' motion for judgment as a matter of law, the court will address only the defendants' arguments regarding the statutory damages award against the corporate defendants, which totals $300,000 across the three cases.

A.    Parties' Arguments

The defendants argue that none of the three $750,000 damages awards has a basis in evidence and that each of the awards far exceeds the damages typically awarded in cases like these in this district. Dkt. No. 52 at 13. They contend that statutory damages should serve as a "proxy" for actual damages and should not provide a windfall to the prevailing plaintiff. Id. at 14–15. The defendants maintain that the court instructed the jury to consider the plaintiff's lost revenues when determining the damages award. Id. at 15. They argue that despite these instructions, not one of the $750,000 awards has any connection to the actual damages the plaintiff suffered as a result of the defendants' purchase of twelve counterfeit water pipes. Id. at 16–17. According to the defendants, the plaintiff suffered $3,600 in lost revenue and $2,448 in lost profits due to the defendants' infringement. Id. at 16–17. They argue that the defendants saved less than $2,500 in expenses due to purchasing the counterfeit pipes versus the authentic product. Id. at 17. The defendants

29

contend that each $750,000 award represents more than thirteen percent of the plaintiff's total annual revenue from the Stündenglass pipes, which they assert seems excessive given the small scale of the infringement. Id.

The defendants argue that the plaintiff has filed nearly 1,000 cases about counterfeit Stündenglass water pipes, most resulting in default judgment. Id. at 9. They assert that although the plaintiff requests $150,000 in damages when it moves for default judgment, most courts in this district have awarded $10,000, $20,000 or at most $75,000 in damages on a default judgment. Id. at 9–11 (collecting cases). The defendants contend that these cases involve analogous claims and facts, and in each case, the court has "focused on the minimal case-specific harm" when assessing damages. Id. at 19–20 (collecting cases). They argue that in those cases, as in this one, there was no evidence of a "widespread counterfeiting operation" or "egregious disregard" for the plaintiff's trademark rights, which may support a higher award. Id. at 21.

The defendants argue that the court should order a new trial with the option of remittitur to a single, $20,000 award. Id. at 22–23. They contend that under the Lanham Act, damages are awarded "per counterfeit mark per type of goods or services sold," not based on each infringing item sold. Id. at 23–24 (quoting 15 U.S.C. §§1117(c)(1)–(2)). They assert that each mark infringed can form the basis of only one award against a set of defendants. Id. at 24 (quoting Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc., 658 F.3d 936, 946 (9th Cir. 2011)). The defendants assert that the plaintiff cannot receive the same award multiple times from jointly and severally liable defendants. Id. The defendants

30

argue that in this case, the plaintiff filed three cases—one for each of the three counterfeit pipes its investigators bought. Id. at 25. They contend that the plaintiff should not be able to double or triple its award by suing the same defendants in multiple cases. Id. at 25–26. The defendants assert that even if the court chooses not to remit the $100,000 statutory damages award in each case, it still should impose the award only once against the defendants. Id. at 26.

The defendants also argue that the damages awards are unconstitutional and violate due process. Id. at 27. They argue that the Due Process Clause prohibits imposing statutory damages that are "wholly disproportionate to the offense and obviously unreasonable." Id. at 27–28 (quoting St Louis, I.M.&S. Ry. Co. v. Williams, 251 U.S. 63, 66–67 (1919)). The defendants argue that the harm in this case is quantifiable and relatively small, yet each $750,000 award is "more than 306 times" the plaintiff's lost profits. Id. at 29. They maintain that such a large ratio between the actual harm and the award is a sign of unreasonableness. Id. at 30.

The plaintiff responds that the damages the jury awarded are reasonable and "well within statutory limits" considering that the Lanham Act allows statutory damages of up to $2 million per willfully used counterfeit mark. Dkt. No. 58 at 7. It says that the evidence presented at trial showed that its Stündenglass brand suffered "intangible damage" to its reputation and goodwill because of the defendants' infringement. Id. at 8. The plaintiff asserts that it has spent millions of dollars marketing its brand and products, including

31

cultivating a reputation for its high-quality products. Id. According to the plaintiff, when consumers buy a counterfeit water pipe, they experience quality control issues that damage the consumer's perception of the brand. Id. at 9. The plaintiff argues that the jury properly considered this reputational harm when awarding damages and that the jury's damages awards are consistent with the evidence. Id. at 9–10.

The plaintiff asserts that the statutory damages were properly imposed for deterrent purposes. Id. at 13. It argues that counterfeiting is a known problem in the smoke shop industry and that its own products have been heavily counterfeited. Id. The plaintiff maintains that the damages award in this case will have a deterrent effect, not just on the defendants, but on the industry. Id. at 13–14.

The plaintiff contends that statutory damages need not be tied to its actual damages. Id. at 14. According to the plaintiff, courts place less emphasis on the amount of actual damages when the plaintiff opts to seek statutory damages. Id. at 14–15 (collecting cases). The plaintiff argues that the defendants underestimate their actual damages, asserting that there were more counterfeit pipes sold than the defendants admit to having purchased. Id. at 15–16. Again, the plaintiff believes this is so because the defendants claim to have purchased the Kompact version of the water pipe before it was available on the market. Id.

The plaintiff argues that the court should not consider the damages awarded in other default judgment cases because the procedural postures of

32

the cases are not the same. Id. at 16–17. It asserts that default judgments are not binding precedent and necessarily do not involve the level of discovery and testimony obtained in this case. Id. at 17. The plaintiff contends that the issue is not whether a judge would have awarded a lesser amount in damages, but whether the jury's awards are excessive. Id. The plaintiff argues that the defendants provide no comparable cases against which to judge the award; it asserts that $750,000 is a reasonable award for willful trademark infringement based on two cases awarding $2 million and $300,000 per mark respectively. Id. at 18–19 (citing Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd., No. CV 14-2307, 2014 WL 4679001, at *12 (C.D. Cal. Sept. 18, 2014); H-D U.S.A., LLC v. SunFrog, LLC, 311 F. Supp. 3d 1000, 1049 (E.D. Wis. 2018)).

The plaintiff next argues that the defendants' argument for a single damages award is both waived and based on an incorrect interpretation of the Lanham Act. Id. at 20. The plaintiff emphasizes that the defendants did not object to submitting three verdict forms to the jury or object to the jury instructions informing the jury to return three independent verdicts. Id. It asserts that the defendants cannot raise this new argument for the first time on a Rule 59 motion when it could have been brought earlier. Id. at 20–21. The plaintiff says that consolidated cases retain their separate identities and that they require separate verdicts and judgments to preserve each party's rights. Id. at 21. The plaintiff argues that the court cannot now eliminate the separate verdicts retroactively in favor of a single verdict. Id.

33

The plaintiff argues that even if the defendants had not waived this argument, the argument is not supported by the Lanham Act. Id. at 22. The plaintiff asserts that none of the cases the defendants cite in support of their argument are consolidated cases; they say that all of them are single cases against multiple defendants. Id. The plaintiff says that here, there are three separate cases based on three independent acts of infringement that were all proven at trial. Id. The plaintiff agrees that damages are not awarded per item but asserts that damages may be awarded *per case* when the cases arise from separate infringing acts. Id. at 23.

The plaintiff argues that the damages awards are not so severe and oppressive as to violate the Due Process Clause. Id. at 23–24. It contends that statutory damages under the Lanham Act are compensatory, not punitive, so the defendants' argued framework does not apply. Id. at 24–25. The plaintiff also maintains that the defendants' calculation of the "harm" suffered because of their infringement does not take into account the damage to the plaintiff's brand or the deterrent aspects of the damages award. Id. at 25. It says that large multipliers between actual damages and statutory damages are permissible because statutory damages are not necessarily tied to actual damages. Id. at 26.

The defendants reply that the plaintiff "ignores" the case law requiring that statutory damages be related to actual damages. Dkt. No. 62 at 4 (collecting cases). They argue that none of the plaintiff's cases support granting the prevailing party a windfall that far exceeds its actual harm. Id. at 4–5. The

34

defendants asserts that although deterrence is a relevant factor to consider when computing statutory damages, the award still must be reasonable based on the facts of the case. Id. at 6. They argue that the small size and scope of the counterfeiting in this case is relevant to the determination of what amount will serve a deterrent purpose. Id. The defendant argues that there is no evidence other than the plaintiff's speculation that the defendants placed additional orders for the Kompact water pipes. Id. at 7. The defendants assert that there is evidence supporting only a single purchase of twelve counterfeit pipes, which makes a $20,000 award far more reasonable. Id. at 7–8.

The defendants argue that the plaintiff failed to show that these awards are comparable to awards made in other similar cases. Id. at 8. They contend that the awards the plaintiff received in other cases in this district were awarded on default judgments, which suggests that the awards might be higher than they would have been had the defendant appeared and defended the suit. Id. at 8–9. The defendants maintain that in this case, there is no evidence of willfulness justifying a higher damages award, because the defendants were unaware of the plaintiff's brand and did not know that the products were counterfeit. Id. at 10.

The defendants assert that the plaintiffs brought three cases for separate acts of "infringement" when actually there were three, separate sales of the same counterfeit pipes. Id. at 11. They contend that filing three cases for three items violates the Lanham Act's rule that a mark holder cannot recover a separate award for each item bearing the counterfeit mark. Id. at 11–12. The

defendants argue that they are jointly and severally liable for the jury awards, so multiple verdicts against them violate the requirement that the plaintiff can recover a single statutory award. Id. at 12. They assert that the plaintiff cannot avoid this limitation by suing the same defendants in multiple cases over the same infringing product. Id. The defendants contend that the court still can consider this argument even though prior counsel did not object to the verdict forms and jury instructions. Id. at 13–14.

The defendants maintain that due process prevents statutory damages from becoming a punitive windfall. Id. at 14–15. They argue that the cases the plaintiff cites in support are distinguishable because in this case, the counterfeiting operation was much smaller in scale than those in the cited cases. Id. at 15–16. Finally, the defendants direct the court to their motion for judgment as a matter of law in support of their argument that the court should grant a new trial on the issues of willfulness and Sati's individual liability. Id. at 16–17.

B.    Legal Standard

Federal Rule of Civil Procedure 59(a) states that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party," Venson v. Altamirano, 749 F.3d 641, 656 (7th Cir. 2014), or if the damages awarded are excessive, Gen. Foam

36

<u>Fabricators, Inc. v. Tenneco Chemicals, Inc.</u>, 695 F.2d 281, 288 (7th Cir. 1982). To determine whether a damages award is excessive, the court considers "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." <u>G.G. v. Grindle</u>, 665 F.3d 795, 798 (7th Cir. 2011) (citation omitted). The Seventh Circuit has explained that the "monstrously excessive" standard and the "rational connection" standard "are really just two ways of describing the same inquiry: whether the jury verdict was irrational." <u>Adams v. City of Chicago</u>, 798 F.3d 539, 543 (7th Cir. 2015) (citations omitted). "In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict" in order to "preserve the jury's role as the trier of fact." <u>Id.</u>

Generally, if the jury's damages award is excessive, "remittitur, not a new trial, is the appropriate remedy." <u>Spina v. Forest Pres. Dist. of Cook Cnty.</u>, 207 F. Supp. 2d 764, 771 (N.D. Ill. 2002) (citing <u>Davis v. Consolidated Rail Co.</u>, 788 F.2d 1260, 1263 (7th Cir. 1986)). But a "true" remittitur order must give the plaintiff the option of a new trial in lieu of a reduced monetary award. <u>Adams</u>, 798 F.3d at 541 (citing <u>Dimick v. Schiedt</u>, 293 U.S. 474, 482–83 (1935)).

C.    <u>Analysis</u>

Because the court is vacating the judgment of willfulness and the associated enhanced damages, the remaining questions are whether the

37

$100,000 statutory damages awards should be reduced and whether the three separate awards should stand. Under the Lanham Act, a plaintiff can seek statutory damages between $1,000 and $200,000 per counterfeit mark per type of good sold, offered for sale or distributed. 15 U.S.C. §1117(c)(1). When determining statutory damages, "[c]ourts may consider factors such as 'the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent to future copyright infringement.'" Ent. One UK Ltd. v. 2012Shiliang, 384 F. Supp. 3d 941, 953 (N.D. Ill. 2019) (quoting Chi-Boy Music, 930 F.2d at 1229). "Moreover, the Lanham Act allows statutory damages to be large even when actual damages are small, for the very reason that deterring counterfeiting is important." SunFrog, 311 F. Supp. 3d at 1048 (citing Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli, 575 F.3d 693 (7th Cir. 2009)).

The defendants identified over twenty default judgments the plaintiff has obtained in similar cases in this district. Dkt. No. 52 at 10–11 (collecting cases). The awards in those cases typically range from $10,000 to $75,000, though in a few outlier cases courts awarded the full $150,000 in damages the plaintiff requested without performing a damages analysis. But the question here is whether the jury's verdict is excessive compared with similar jury verdicts, not whether it is excessive compared with default judgment awards. And although "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness[,] they do not establish a range beyond which awards are necessarily excessive.'" Vega v. Chi. Park Dist., 954 F.3d

38

996, 1008 (7th Cir. 2020) (quoting Farfaras v. Citizens Bank & Tr. of Chi., 433
F.3d 558, 566 (7th Cir. 2006)).

In counterfeiting cases, courts have awarded or upheld statutory
damages awards that are significantly higher than the estimated actual
damages suffered because of the infringement. See, e.g., Deckers Outdoor
Corp. v. Australian Leather Pty. Ltd., No. 16 CV 3676, 2020 WL 4723980, at
*3–4 (N.D. Ill. July 13, 2020), aff'd sub nom. Deckers Outdoor Corp. v.
Australian Leather Pty Ltd, No. 2020-2166, 2021 WL 1827945 (Fed. Cir. May 7,
2021) (declining to remit jury award of $450,000 where actual damages were
an estimated $1,200); Ent. One UK, 384 F. Supp. 3d at 953–54 (awarding
$100,000 in statutory damages despite relatively low actual damages in light of
the plaintiff's significant efforts to protect its brand).

The statutory damages award is not so monstrously excessive that it
justifies remittitur. The plaintiff presented evidence at trial that it has invested
significant time and resources in its brand and in marketing. See Dkt. Nos. 43
at 180–192, 202:1–203:4; 44 at 324:3–17. The plaintiff also presented expert
witness testimony that a single negative interaction can harm a brand's
reputation in the eyes of a consumer. Dkt. No. 44 at 293:1–9. The plaintiff
presented evidence that consumers contact the plaintiff about poor quality
products that they believe the plaintiff manufactured but that are counterfeit
products. Dkt. No. 43 at 215:6–216:13. A rational jury could have found that
the negative impact to the plaintiff's brand and goodwill in the marketplace
justifies the statutory damages award of $100,000. The award is not so

39

monstrously excessive, disconnected from the evidence or out of line with comparable cases to justify disturbing the jury's verdict.

Nor must the award be remitted to a single verdict awarded jointly and severally against all defendants. As the plaintiff points out, the defendants did not object to submitting three separate verdict forms to the jury or to the court's instruction that the jury should return three separate verdicts. The defendants did not argue that these cases were duplicative or otherwise barred by the Lanham Act. The defendants assert that the court has the discretion to consider untimely arguments in a Rule 59 motion, but have provided no authority holding that the court may exercise this discretion to eliminate or combine judgments resulting from multiple jury verdicts into a single judgment under Rule 59, especially when no such argument was raised prior to trial. See Prepared Food Photos, Inc. v. Jaber, 780 F. Supp. 3d 779, 789 (E.D. Wis. 2025) (rejecting Rule 59 motion seeking to alter judgment based on purported errors with the jury verdict); see also Moro v. Shell Oil Co., 91 F.3d 872, 876 (7th Cir. 1996) (Rule 59 does not allow a party to "undo its own procedural failures," to "introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment"). The defendants' argument is untimely and they have waived it.

Finally, the defendants argue that the damages awards violate due process, asserting that statutory damages can be unconstitutionally excessive. But they rely on cases discussing civil penalties and punitive damages, not statutory damages designed to compensate the plaintiff. The defendants'

40

primary case, <u>United States v. Dish Network L.L.C.</u>, 954 F.3d 970 (7th Cir. 2020), discusses civil penalties awarded under the Telephone Consumer Protection Act. The Seventh Circuit stated that a total damages award under the TCPA "could be a constitutional problem only if a *combination* of compensatory and punitive damages . . . violated the Due Process Clause." <u>Id.</u> at 980 (emphasis added); <u>see also</u> <u>Curry</u>, 124 F.4th at 454 (discussing that, unlike compensatory damages, there are constitutional limits on punitive damages). The court is vacating the additional damages awarded for willfulness, which is the portion of the award that could be considered punitive. The remaining $100,000 in statutory damages is a compensatory award. Even if it were considered punitive, the Seventh Circuit has upheld a punitive damages award of $900,000 ($300,000 per defendant) under state law where a jury awarded the seller $2,500 in actual damages under the Lanham Act. <u>See</u> <u>Curry</u>, 124 F.4th at 463. The statutory damages awards do not violate due process.

The defendants have not shown that the $100,000 statutory damage award in each of the three cases is excessive or unconstitutional. The court will deny the defendants' motion for a new trial with the option of remittitur.

## IV.  Conclusion

The court **GRANTS** the defendants' renewed motion for judgment as a matter of law. Dkt. No. 54.

The court **VACATES** the judgments against Khaldon Sati in Case Nos. 23-cv-742, 23-cv-1054 and 23-cv-1056. The court **VACATES** all damages

assessed against the defendants for willfulness in Case Nos. 23-cv-742, 23-cv-1054 and 23-cv-1056. The clerk will enter amended judgments accordingly.

The court **DENIES** the defendants' motion for a new trial with the option of remittitur. Dkt. No. 52.

Dated in Milwaukee, Wisconsin this 19th day of December, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**